UNITED STATES OF AMERICA
DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

THOMAS SCHRAMM

    plaintiff                        Case No.

v.                                           Hon:

NEENAH PAPER MICHIGAN INC.

    defendant
_____/

Attorneys for plaintiff:
NACHT & ROUMEL, P.C.
Nicholas Roumel (P37056)
101 N. Main St., Ste. 555
Ann Arbor MI  48104
734-663-7550
*nroumel@nachtlaw.com*

MARCOTTE LAW PLLC
Wendy Marcotte (P74769)
102 W. Washington St., Ste. 217
Marquette MI 49855-4350
*wendy@marcottelaw.us*

.

## COMPLAINT AND JURY DEMAND

Plaintiff makes his complaint as follows:

### Introduction

This is the second complaint filed between the parties, and necessitated because Defendant has materially breached the settlement of the first case.

Tom Schramm was employed for over thirty years by Defendant, who originally fired him on March 1, 2021, because he was a whistleblower who reported a major chemical spill to the State of Michigan. Mr. Schramm filed suit in this court.

1

Early in the litigation, the parties settled. Defendant agreed to reinstate Mr. Schramm's employment, pay back wages, and an additional sum as consideration. However, just days before Mr. Schramm was set to resume employment, Defendant fired him a second time.

This lawsuit revives the original claims, as well as additional claims for breach of the settlement agreement, intentional interference with contractual relations, and retaliation under the Employee Retirement and Income Security Act.

**Parties/Jurisdiction/Venue**

1. Plaintiff Thomas Schramm ("Mr. Schramm") is a resident of Munising, Alger County, Michigan.

2. Defendant Neenah Paper Michigan Inc. ("Neenah") is a Delaware corporation doing business in Michigan, with its resident agent at The Corporation Company, 40600 Ann Arbor Rd. E. Ste. 201, Plymouth MI 48170.

3. The events giving rise to this lawsuit occurred at Neenah's manufacturing plant, the Neenah Munising Mill, located in Munising, Alger County, Michigan ("the plant"), where Plaintiff was employed.

4. Jurisdiction is proper in this court under 28 U.S.C. §1331 (federal question jurisdiction under the Employee Retirement and Income Security Act, 29 USC §1001 *et seq.*; and the diversity jurisdiction provisions of 28 USC § 1332 (a) (1), as Plaintiff is a resident of Michigan and the amount in controversy exceeds $75,000. Supplemental jurisdiction over Plaintiff's state law claims are proper pursuant to 28 U.S.C. §1367 as they arise from the same case and controversy.

5. Venue is proper in the Western District of Michigan per 28 USC § 1391 (b) (1) and (2), as the cause of action occurred in Alger County, Michigan.

### Mr. Schramm's First Termination

6. Mr. Schramm was employed with Neenah as its Fire Chief, and he was a member of the United Steel Workers Union. He began his employment with the plant's predecessor owner, Kimberly Clark, on October 6, 1986.

7. He performed his job capably and was a valued employee.

8. On February 19, 2021, there was a major chemical spill caused by operations at the plant. At approximately 8 AM, a discharge line from a bleach bulk storage line failed, causing the spill of approximately 2000 gallons of bleach within the plant.

9. The plant acted to contain the immediate risk to employees, the environment and the community. The first call for service was made by an employee at approximately 8:41 AM, to Alger County Central Dispatch (911). The employee requested that Munising Fire be dispatched for a major chemical spill and identified the chemical as bleach. The employee further advised that they were in the process of evacuating the plant, as the spill was creating a chemical reaction.

10. Both the Munising and Rock River Fire Departments were dispatched, as well as the Alger County Sheriff's Office and Alger County EMS.

11. At approximately 8:47 AM, the first emergency responders arrived on scene, including but not limited to fire and EMS. Five employees were transported to Munising Memorial Hospital for treatment.

12. News outlets picked up story from scanners and began posting on social media as early as 9:50 AM.

13. Plaintiff's wife learned of the spill from social media and called her husband, the Plaintiff, at approximately 9:53 AM to make sure he was okay.

14. At 9:59 AM, the Plaintiff, Mr. Schramm, called to report the spill to the Michigan State Government Department of Environment, Great Lakes, and Energy ("EGLE"), formerly known as and still commonly referred to as "DEQ" (the Michigan Department of Environmental Quality."

15. Neenah terminated Plaintiff's employment, effective March 1, 2021, because he made a report of the bleach spill to EGLE, which responded to and monitored the cleanup.

16. Neenah stated in Plaintiff's termination letter of March 2, 2021, that in making that report, Plaintiff violated his "signed confidentiality agreement."

17. Neenah further explained, in response to a Union grievance, that:

> Tom placed an unauthorized call to the DEQ acting on behalf of Neenah, as clearly shown in the incident report he published (attached). The only employee authorized to make such a call outside of the Mill Manager, is our Environmental Engineer. This is a violation of Tom's signed confidentiality agreement, which states: "I will assume any particular information about the Corporation's business is confidential until I am informed it is not or until it has been published or is generally or publicly known outside the Corporation or (in the case of information about processes, procedures, machinery and equipment) until it has been recognized as standard practice outside the Corporation.

18. These reasons were pretext, for reasons including but not limited to the following:

   a. The confidentiality agreement is intended to protect trade secrets and proprietary information, not industrial accidents.

      b.      To the extent it may apply, before Mr. Schramm made his report to EGLE, the bleach spill was publicly known and reported in social media.

      c.      On information and belief, there is no rule or policy forbidding Mr. Schramm, as the plant's Fire Chief, from making reports of fire or other environmental hazards to governmental bodies.

### Mr. Schramm Files Suit, and the Parties Resolve the Case

19.    Mr. Schramm first contested his termination by way of a Union grievance, filed on March 3, 2021. The grievance stated:

> **COMPLAINT**
>
> The Union charges the Company with a specific violation of Article (s) __Unjustified Termination__ and any other provisions of the Agreement that may be found to apply.
>
> STATE WHAT HAPPENED: __Tom called the DEQ to advise them of a bleach spill at the Munising Mill. He was terminated because of that call.__
>
> **REMEDY REQUESTED** __Reinstate Tom in his position at the mill and make him whole.__

20.    While the grievance was pending, Mr. Schramm also filed his original complaint on May 6, 2021. [Case No. 2:21-cv-00093, ECF 1]

21.    On July 19, 2021, the parties attempted to resolve the matter with a mediator, but were unsuccessful.

22.    However, the parties continued to negotiate in good faith, and agreed to a stay of litigation pending the outcome of the grievance arbitration.

23.    A joint status report was filed with this court on September 2, 2021, recommending a stay. [Case No. 2:21-cv-00093, ECF 9]

24. A telephonic status conference was held on September 8, 2021, with the Hon. Magistrate Judge Maarten Vermaat. The outcome of that status conference was as follows:

> **NATURE OF HEARING:** Telephone status conference
>
> This was the time set for a Rule 16 conference. The parties advised that the case is in arbitration. The Rule 16 conference will be adjourned to January pending the outcome of arbitration.

[Case No. 2:21-cv-00093, ECF 10]

25. After the status conference, Neenah attempted to resolve the pending grievance and avoid arbitration with the union by proposing a return-to-work agreement.

26. In addition, undersigned counsel engaged in negotiations with Neenah's litigation counsel, making an additional offer to resolve the lawsuit contingent on Mr. Schramm's reinstatement.

27. On October 6, 2021, following rejection by the union of the proposed return-to-work agreement, Neenah granted Mr. Schramm's unjust discharge grievance, unconditionally reinstating him with back pay, as follows:



6

28. The next day, October 7, 2021, Neenah's litigation counsel confirmed that the company was unconditionally reinstating Mr. Schramm, and that the reinstatement was not contingent on dismissal of the lawsuit. He sent the following letter via email:

October 7, 2021

Re: *Schramm v. Neenah Paper Michigan, Inc., Case No. 21-CV-000093*

Dear Mr. Roumel and Ms. Marcotte:

As you are likely aware, Neenah Paper has granted the union's grievances related to Mr. Schramm's discipline and discharge, and, as a result, is reinstating him to his position with full back pay on October 18, 2021. Consistent with the resolution of that grievance, and to avoid any doubt, please convey to Mr. Schramm that Neenah Paper is making an unconditional offer to reinstate him to his position at Neenah, effective October 18, 2021. He may return to work without dismissing his current litigation against the company.

Sincerely,

**DYKEMA GOSSETT PLLC**
James F. Hermon

29. On October 13, 2021, Plaintiffs' counsel delivered an offer to additionally settle the litigation.

30. Mr. Hermon, Neenah's litigation counsel, delivered a counter on October 14, 2021.

31. The parties reached terms resolving the litigation on October 16, 2021. Undersigned counsel emailed Mr. Hermon as follows:

> Jim – we will accept your revised Option 1 with a 1/3/22 return date and $35,000. As I understand it:
>
> - Mr. Schramm returns to the company payroll on Monday 10/18, as agreed to in resolution of his grievances with the Union, and receives his back pay through October 17, 2021.
> - He also would return to regular company benefits at that time.
> - He would return to active work January 3, 2021 and would not receive back pay for this time period between 10/17 and 1/3, but it would not constitute a break in service. His service will be restored in full when he returns to the payroll Monday 10/18.
> - That would permit him to take the vacation he has scheduled, but would not have him taking a vacation immediately after returning from being off work for more than six months. However, he will have six weeks' vacation immediately available to him on 1/3 as if he had returned the entire year for 2021.
> - Neenah will also pay a total of $35,000 under this scenario, and Mr. Schramm would agree to a release of all claims (including an agreement not to grieve the vacation time issue) and dismissal of the litigation.
>
> If this is your understanding as well, please draw it up and let me know what else you need. I'll likely have you send a check to our firm and I am providing you our firm's W9 (which is attached). Feel free to also prepare a stipulation to dismiss the court case.
>
> Thanks for working on the weekend to resolve this –
>
> Nick Roumel

32.     Mr. Hermon responded the next day:

The terms below are accurate, with one correction: he returns to work 1/3/2022, not 2021 (obviously). I'll get the settlement agreement put together and to you ASAP once our client approves.

33. On or about October 29, 2021, Mr. Schramm received back pay in the gross amount of $45,315.77.

34. The parties continued to discuss and iron out details attendant to the reinstatement and "make-whole" remedy, including issues concerning insurance coverage, open enrollment for the coming year, and the timing of incentive pay.

35. Specifically, significant questions arose: (a) the proper calculation of back pay, (b) whether there was a gap in medical insurance for the period October 1 – October 18, 2021, and (c) whether and to what extent Mr. Schramm was responsible for premium payments to ensure continuous coverage.

36. In order to resolve the above issues, Mr. Schramm also attempted to work through his Union to communicate with Neenah Human Resources.

37. On November 18, 2021, undersigned counsel emailed a revised proposal to settle the litigation, stating: "Jim, let's put this to bed. Does this work for you? Let's leave any details of back pay to the union and company."

38. On November 19, 2021, Mr. Hermon responded, "I've forwarded to my client for approval, but I think this is a reasonable way to proceed. Hope to have an answer shortly."

39. Five days later, on November 24, 2021, Mr. Hermon emailed Plaintiff's counsel: "Thanks for your patience. I've gotten authority from my client to accept the revised proposal you sent. They're out of office today, so I can't get you a signature until next week, but we've got a deal."

40. Ms. Marcotte confirmed the same day, emailing: "Thank you, Jim, We accepted all changes and will forward the attached to our client for signature."

9

41. On December 2, 2021, Mr. Schramm signed the settlement agreement.

42. The next day, Mr. Roumel sent the signed agreement to Mr. Hermon for Neenah's signature.

43. On December 6, Noah Benz, Neenah's corporate counsel, signed the settlement agreement on Neenah's behalf. [Exh A] Mr. Hermon emailed it to plaintiff's counsel with a proposed stipulated order of dismissal.

44. On December 13, 2021, the stipulation of dismissal was filed, and the settlement funds were received via wire transfer by Plaintiff's counsel Mr. Roumel.

**Mr. Schramm Was Terminated a Second Time Even Before Returning to Work**

45. On December 28, 2021, along with his Union representative, Chris Haddock, Mr. Schramm was on a "return to work" phone call with Monica Howe, Vice President of Human Resources for Neenah.

46. At the beginning of the call, Ms. Howe notified Mr. Schramm that Neenah would not be returning him to work on January 3, 2022 as agreed. When asked for an explanation, she cited alleged problematic behavior dating back to mid-October and explained that they held off on notifying him due to the holidays. She later provided him a termination letter stating:

> December 28, 2021
>
> Mr. Thomas G. Schramm
> 1411 Center Street
> Munising, MI 49862
>
> Dear Tom,
>
> Effective December 28, 2021, you were informed that Neenah is terminating your employment. The decision to end your employment is due to a series of concerning behavior over the past several weeks. This behavior is inconsistent with Neenah's values and is a violation of our harassment and inappropriate behavior policy.

47. Undersigned counsel contacted Neenah's counsel to obtain justification for this apparent breach of a meticulously negotiated global settlement.

48. On January 12, 2022, Mr. Hermon emailed to counsel, "The Company does not believe that we have an obligation to provide the documentation to the Union regarding the justification for our decision to terminate Tom Schramm's employment with Neenah on December 28, 2021. However, in the spirit of cooperation we are willing to share the following complaints we received." He went on to cite the following:

- Employees have expressed concern over Tom's reference to a "hit list" with 5 names on it. (hourly)
- Employees expressed concerns because Tom was repeatedly asking about Kathy Hill's whereabouts. (hourly)
- Employee quoted Tom saying he made statements he was coming back to work "to raise hell." (hourly)

There are others, but we are not providing them because doing so would likely identify the persons who complained, and we are concerned for those employees' safety should their identities be disclosed.

49. Neenah has not communicated since, rebuffing further efforts to explain or negotiate the matter.

11

50. Moreover, Neenah's unsupported allegations that hourly workers made these complaints against Mr. Schramm have created disagreement within the Union preventing the filing of a new grievance to contest this second termination.

51. But for Neenah's perpetuation of a false narrative, the Union would have filed a grievance concerning Mr. Schramm's unjust second termination.

52. On information and belief, the basis for Neenah's second termination alleging threatening behavior by Mr. Schramm (who was not even in the state of Michigan during the relevant time period) are false, and pretext for Neenah to renew its retaliatory conduct towards him.

## LEGAL ALLEGATIONS
### *Count I – Whistleblower Protection Act*

53. EGLE is a public body as defined by the Whistleblower Protection Act, MCL § 15.361.

54. Plaintiff engaged in protected activity under MCL § 15.362 when he made his report of the chemical spill to EGLE.

55. Defendant was aware of Plaintiff's protected activity.

56. The Whistleblower's Protection Act, MCL § 15.362, states in relevant part that:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

57. At all relevant times, Plaintiff acted in good faith and believed the report to be true; he was borne out in this good faith belief by the public response, and the plant manager's public statements verifying the spill and thanking the first responders.

58. Defendant terminated Plaintiff because of his protected activity, and refused to reinstate him, in violation of the Whistleblower's Protection Act, MCL § 15.362.

59. Defendant's violation of the Whistleblower Protection Act has damaged Plaintiff as alleged herein and below.

## Count II
### *Breach of Settlement Agreement*

60. The parties reached a global resolution of Mr. Schramm's Union grievance and legal claims, as described above and in the settlement agreement attached as Exhibit A.

61. An agreement to settle a pending lawsuit is a contract and is to be governed by the legal principles applicable to the construction and interpretation of contracts.

62. Defendant breached the settlement without cause and in bad faith when it terminated him a second time just prior to his agreed-on return-to-work date.

63. Defendant's breach has damaged the Plaintiff as alleged herein and below.

## Count III
### *Intentional Interference with Contractual Relations*

64. Plaintiff had a valid business relationship with his Union, United Steel Workers, Local 2-96, ("USW" or "the Union") as his exclusive bargaining unit representative with regard to the collective bargaining agreement between the USW and Neenah.

65. Neenah was aware of that relationship, and the Union's prior advocacy on Mr. Schramm's behalf, the first time he was terminated.

66. Defendant intentionally interfered with that relationship by propagating a false and misleading narrative, which influenced the Union, and caused them to believe that Mr. Schramm's fellow Union members felt threatened by him and/or were apprehensive about him returning to work.

67. Neenah's propagation of a false and misleading narrative, together with provision of misleading information to the Union caused them to determine that they would not advocate for Mr. Schramm following his second termination.

68. This interference by Neenah, into the contractual relationship between Mr. Schramm and his Union, was improper and unjustified.

69. This interference has damaged Plaintiff by denying him the representation to which he was entitled, the advocacy that had previously helped him secure reinstatement to his job, contractual rights under the labor agreement, and the attendant salary and benefits he would have earned from that job.

## Count IV
### *ERISA Retaliation*

70. Defendant is an employer, and a "person" under the definitions of the Employee Retirement and Income Security Act ("ERISA"), 29 USC §1002.

71. Neenah's health insurance plan is an employee benefits plan under ERISA.

72. When Mr. Schramm was working through his Union to clarify and secure his rights under Neenah's health insurance plan, as set forth in paragraphs 35 and 36 above, he was engaging in protected activity under ERISA §510 (29 USC §1140), as he was "exercising any right to which he [or she] is entitled under the provisions of an employee benefit plan."

73. When Mr. Schramm's employment was terminated a second time, he suffered an adverse employment action.

74. Neenah's second termination of Mr. Schramm was intentional, and motivated by his protected activity, through his Union, of attempting to secure rights under his employee benefit plan, to which he was entitled.

75. Neenah has propagated the false and pretextual narrative that Mr. Schramm's attempts to secure his rights were harassing.

76. Neenah's illegal termination of Mr. Schramm constitutes ERISA retaliation under §510, and has damaged him as alleged herein and below.

**Damages**

77. As a direct and proximate result of defendants' actions, Plaintiff suffered damages as follows:

15

a.      *Economic Damages* – lost wages, fringe benefits, and earning opportunity resulting from his termination, attorney fees, incidental and consequential damages.

b.      *Non-Economic Damages* – harm to reputation, emotional distress, mental anguish and continuing mental anguish, denial of social pleasures and enjoyment, inconvenience, embarrassment, ridicule, humiliation, mortification, fear, and/or outrage, as warranted by the proofs.

78.     At all time's relevant, Plaintiff has made a good faith effort to mitigate his damages.

## Jury Demand

Mr. Schramm demands a jury trial.

## Relief Requested

*W H E R E F O R E*  Plaintiff Thomas Schramm requests this honorable court grant him the following relief:

a.   In excess of $75,000 damages against Defendant, as warranted by the law and the proofs, including:

   i.   economic and non-economic damages as described above; and

   ii.  the greatest combination of exemplary or emotional distress damages as permitted by law;

b.   costs and pre- and post- judgment interest as permitted by law;

c.   attorney fees as permitted by law;

d.   reinstatement of the Plaintiff to his former position, with full restoration of back pay, fringe benefits, and seniority rights, in addition to his other damages;

  e. other remedies as are just, appropriate, and permitted by law or equity.

          Respectfully submitted,

          Attorneys for Plaintiff:

          NACHT & ROUMEL, P.C.

          *s/Nicholas Roumel*

          Nicholas Roumel

          *s/Wendy Marcotte*

March 2, 2022       Wendy Marcotte